

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00121-CV

| | | |
|---|---|---|
| In the Interest of J.P., M.A., and M.V., Children | § | From the 323rd District Court |
| | § | of Tarrant County (323-94161J-11) |
| | § | November 29, 2012 |
| | § | Opinion by Justice Gabriel |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS


By_____
Justice Lee Gabriel



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-12-00121-CV

IN THE INTEREST OF J.P., M.A.,
AND M.V., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant H.P. (Mother) appeals the termination of her parental rights to her children, J.P. (Jeffery), M.A. (Monica), and M.V. (Mark).[2] Appellant A.V. (Father) appeals the termination of his parental rights to his child, Mark. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

[2]We use aliases for the children and their parents throughout this opinion. *See* Tex. R. App. P. 9.8(b)(2).

## Background Facts

The Department of Family and Protective Services (DFPS or the Department) first became involved with Mother in 2009 when it received a referral for neglectful supervision. Mother's oldest son, Jeffery, had fallen off of a second-floor balcony.[3] Jeffery was three years old at the time. Mother explained that she had been folding clothes in the bedroom and had left Jeffery and Monica in the other room for approximately twenty minutes. Jeffery opened the sliding glass door to the balcony, stood on top of a trash can and fell over the railing. Mother said that Jeffery had opened the glass door before and had unlocked the front door in the past too. Jeffery did not suffer any physical problems after his fall. DFPS placed the children with a friend of Mother's family. Mother completed her services, and the children were returned to her care.

In March 2010, Mother gave birth to her youngest child, Mark. Mother and Father were raising all three children together. The children consider Father their father.

In March 2011, Mother and Father brought Mark to Cook Children's Medical Center with swelling to his head. An examination by Dr. Sophia Grant, a pediatrician at Cook Children's, revealed a skull fracture and a possible fracture of his tibia. Mark was not yet a year old at that time and could not walk on his

---

[3]After a diligent search, Jeffery's alleged father, M.A.C., and Monica's alleged father, S.A., could not be located before trial. The trial court terminated M.A.C.'s and S.A.'s parental rights, and they are not parties to this appeal.

own. Dr. Grant testified that Mark's head injury could not have occurred from him hitting his head on a wall, which had been one of the explanations Mother had offered. Dr. Grant also testified that Mark's leg injury was not the kind of injury that occurs accidentally.

DFPS took custody of Mark. Father refused to tell DFPS how to find Monica and Jeffery. Mother was also uncooperative. DFPS was eventually able to find Monica and Jeffery, and all three children were put in foster care.

After a bench trial, the trial court found that Mother had knowingly placed or had knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, that she had engaged in conduct or had knowingly placed the children with persons who had engaged in conduct that endangered their physical or emotional well-being, and that termination of her parental rights was in the children's best interest. The trial court also found that Father had knowingly placed or had knowingly allowed Mark to remain in conditions or surroundings that endangered his physical or emotional well-being, that he had engaged in conduct or had knowingly placed Mark with persons who had engaged in conduct that endangered his physical or emotional well-being, and that termination of his parental rights was in Mark's best interest. Mother and Father then filed this appeal.

**Standard of Review**

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be

5

established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also* § 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

**Discussion**

**I. Endangerment**

In Mother's first two issues, she challenges the legal and factual sufficiency of the evidence supporting the trial court's findings that she endangered the children. In Father's first two issues, he challenges the legal and factual sufficiency of the evidence supporting the trial court's findings that he endangered Mark.

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could

reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness-credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parents violated subsection (D) or (E) of section 161.001(1). Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the

7

disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

"Endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under subsection (D), it is necessary to examine evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *See id.* at 776–77; *Ziegler v. Tarrant Cnty. Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.).

Under (E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical well-being was the direct result of the parents' conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the

8

parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parents' conduct be directed at the children or that the children actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the children's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the children's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

### A. The evidence

Kriste Moron, a DFPS investigator, was assigned to Mother's 2009 case regarding Jeffery's fall. She testified that the sliding door that Jeffery opened has a bar with a child lock on it. When she showed it to Mother, Mother told her that she did not know what it was. Mother told Moron that Jeffery had gotten out on the balcony on other previous occasions. When asked about what precautions she had taken to keep Jeffery from opening the balcony door and front doors, Mother showed Moron a child safety latch that she used on the front door. Mother did not use the child safety latch on the balcony door, but she did keep it locked.

Mother testified that Jeffery fell from the balcony because he was playing Spiderman while she was in the bedroom. She said that Jeffery only ever got out of the front door once. Mother also offered testimony that conflicted with her

9

previous statement when she testified that the day Jeffery fell was the only time he had ever gotten onto the patio without her knowing. Mother said that she knew that Jeffery knew how to unlock the sliding glass door, but he had always unlocked it in her presence. Mother testified that she was vigilant in watching Jeffery. When asked if she thought she could have prevented Jeffery's fall, she said, "I truly don't know." Mother said she found out that Jeffery had fallen when the emergency medical technicians knocked on her door.

Regarding Mark's head injury, Mother said she was on the couch with Monica and him when the clothes dryer finished its cycle. She left the children on the couch to get the clothes, and when she walked back in the room, Mark was lying on the floor, crying. Mother said she picked him up and checked him for injuries but she did not see any. Mark stopped crying after Mother picked him up.

Later that evening, Mother noticed swelling on Mark's head. She applied a warm compress with salt water to reduce the swelling. Mother noticed that Mark was fussy and restless. Mother testified that she waited about four days before taking Mark to the hospital. She admitted that waiting that long was not the behavior of a vigilant parent, but said that she waited because Mark was not crying. Mother testified that she told a DFPS worker or a police officer that Mark might have hit his head on a wall in her bedroom, but at trial, she said that she did not believe his injury was from hitting a wall.

Dr. Grant said that the leg injury was not a birth injury but that it occurred a few days before the beginning of March 2011. She testified that leg injuries such as Mark's

> happen if, say, for instance, a child is being shaken and the limbs are flailing and flapping back and forth, or say, for instance, in a diaper change, someone gets frustrated and the leg is jerked suddenly so that the insertion of the muscle on the outside edges of the bone actually pulls off a corner part of the bone.

Dr. Grant testified that this type of injury is "an abusive injury." She also said that after the injury occurred, the parent or caretaker might not necessarily know that the injury had occurred. However, she said that "any reasonable person would recognize that the level of force used to cause this type of fracture is inappropriate. It's not just normal diapering . . .; it's a forceful jerk that is inappropriate for this situation."

Mother testified that she had no idea that Mark's leg was injured until the hospital told her. She said that Mark was crawling and able to pull himself up and had never appeared to be in pain. Dr. Grant said the head injury could have occurred accidentally. It could happen when a child falls off of a bed on to a wood floor, or if someone were to accidentally drop the child while carrying him.

Dr. Grant said that it was "highly unlikely" that the skull fracture resulted from hitting the corner of a coffee table because typically those injuries involve a depression in the skull from where the head hit the table. She testified that Mark's injuries were the result of a lack of supervision, which concerned her. The injuries appeared to have occurred within days of each other. Moron

11

testified that Mark's injuries could only have been inflicted by the parents, but she did not know which one injured him.

Moron said that no one reported any other caretakers for the children. At trial, Mother testified that another man had been living with Mother and Father for about three to six months. Mother said that the man did not care for Mark and had only held him once, while Mother watched him. Mother testified there was never a time that the man was alone with Mark. She said that she and Father were the only people who ever cared for Mark.

Monica and Jeffery told a DFPS caseworker, through miming the incidents because of the language barrier, that they had been physically abused at home. Monica said she was dragged by her hair and Jeffery said that he had been hit over the head with a broom. Jeffery had two gash marks on his head that he claimed came from a broom being broken over his head.

Kerrill Mendez, a DFPS conservatorship worker, testified that the fact that Jeffery fell out of a balcony and, two years later, Mark had unexplained injuries to his skull and tibia was concerning because "it seems like there is a continuance in neglect." Mendez testified that the parents were given services before, but she did not think that the parents learned in their previous services because new injuries to the children occurred.

## B. The evidence is legally and factually sufficient

After one of her children opened the balcony door and fell two stories because Mother had left him unsupervised, Mother continued to leave her

12

children unsupervised. Mother was not even aware that Jeffery had escaped and fallen from the balcony until the emergency medical technicians knocked on her door. Two years and one additional child later, Mother proved no more capable of safeguarding her children or knowing that one of them was in need of aid.

After noticing swelling on Mark's head, Mother waited three or four days to seek medical care. Mother claimed that she did not know Mark's leg was injured but at the time he was placed in foster care, Mark had severe problems with his legs and could barely walk. The hospital also noted that Mark was underweight and diagnosed him with failure to thrive.

Despite the parents' insistence that they were the only caretakers, neither parent was able to provide any likely explanation for Mark's injuries. Dr. Grant testified that Mark's tibia fracture was an "abusive" injury that could not have occurred accidentally. *See In re C.W.*, No. 13-08-00112-CV, 2009 WL 140524, at *5 (Tex. App.—Corpus Christi Jan. 22, 2009, no pet.) (upholding trial court's endangerment findings when mother failed to explain child's injuries and doctor's report noted that they were the result of "non-accidental trauma"); *In re J.W.*, No. 02-08-00145-CV, 2008 WL 5056788, at *5 (Tex. App.—Fort Worth Nov. 26, 2008, pet. denied) (upholding trial court's endangerment findings when, among other things, mother continued to allow father to care for children despite father being rough with the children but claiming that he did not know how children got injured). The children told violent stories to DFPS about having their hair pulled

13

and being beaten with brooms. Jeffery had gashes where he said someone had broken a broom over his head. Jeffery also had problems in school, was "very violent" and "really angry," and kicked and punched other children.

Looking at all the evidence in the light most favorable to the trial court's findings, giving due consideration to evidence that the fact finder could reasonably have found to be clear and convincing, we hold that a reasonable trier of fact could have formed a firm belief or conviction that Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, and that she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being. A reasonable trier of fact could also have formed a firm belief or conviction that Father knowingly placed or knowingly allowed his child to remain in conditions or surroundings that endangered his physical or emotional well-being, and that he engaged in conduct or knowingly placed Mark with persons who engaged in conduct that endangered the child's physical or emotional well-being. We overrule Mother's first two issues and Father's first two issues.

## II. Best Interest

In Mother's third issue, she challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that termination of her parental rights was in the children's best interest. In Father's third issue, he challenges

14

the legal and factual sufficiency of the evidence supporting the trial court's finding that termination of his parental rights was in Mark's best interest.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

> (A) minimally adequate health and nutritional care;
>
> (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;
>
> (C) guidance and supervision consistent with the child's safety;
>
> (D) a safe physical home environment;
>
> (E) protection from repeated exposure to violence even though the violence may not be directed at the child;  and
>
> (F) an understanding of the child's needs and capabilities;  and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**A. The evidence**

At the time of trial, Jeffery was almost seven years old, Monica was four years old, and Mark was about to turn two years old. *See* Tex. Fam. Code Ann. § 263.307(b)(1). This case is the second time that DFPS has been involved with Mother. *See id.* § 263.307(b)(2), (4). In 2009, Jeffery and Monica were removed

17

after Jeffery fell from the balcony. Jeffery did not suffer physical injuries from his fall, but Mark had two unexplained injuries—one to his head and one to his leg—when Mother and Father took him to the hospital in March 2011. *See id.* § 263.307(b)(3). Mark had trouble walking when he first went into care and was underweight. He received treatment and had improved over time. *See id.* § 263.307(b)(12)(A).

Mendez testified that the children have indicated that they do not want to return home to Mother and Father. *See id.* § 263.307(b)(5). Mendez said that the children demonstrated "what happened when they were at home." They showed that Monica would be dragged by her hair, and Jeffery said that he had been hit over the head with a broom. Jeffery had two gash marks on his head that he claimed came from a broom being broken over his head. Mother denied ever pulling the children's hair or hitting them with a broom. Mother denied that Father had ever pulled their hair and when asked if he had ever hit them with a broom, she said, "No, I don't know."

Mother testified that Father had a quick temper. *See id.* § 263.307(b)(7). She said, "He gets angry. But he doesn't get angry to the point where he hits somebody. When he gets angry, what he does is he leaves." She said that the last time she saw him get so angry that he had to leave was about two years before trial. Mother testified that Father had never hit her.

Father said,

18

[T]hat thing that the lady is saying that he was hit with a broom, that's a lie, but I do punish him, and when he doesn't understand or I do have him go sit in the corner[.] I don't think any of us here, all of us here in the courtroom, I can't imagine any of us not having reprimanded or punished our children, but that's, what they're saying when you come and you hit them like that, no.

Father said that he had spanked Jeffery but never so roughly as Jeffery claimed. He said, "I love my children. I'm not capable of hitting them or mistreating them." Father testified that he pulled the children's hair "[w]hen [they] were playing."

When DFPS took Mark into custody, Father refused to provide information on Monica and Jeffery's whereabouts. Neither Father nor Mother ever provided an explanation for Mark's injuries. *See id.* § 263.307(b)(9). Mendez explained that one of the goals in the parents' service plans was to demonstrate their ability to protect the children from future abuse or neglect but that neither parent had met that goal. Neither of the parents could identify another caretaker or other person who had the opportunity to harm Mark. At trial, Father still did not provide an answer regarding the perpetrator of Mark's injuries. He said, "I can send him to a day care or they can send [DFPS] to my house to keep supervising the house, and I'll pay for all that. I'll pay for whatever has to be needed." He said that he and Mother had taken Mark to the hospital in February 2011 for bronchitis and that hospital employees did a number of tests on Mark. Father said he saw them pulling Mark's legs.

The parents did not successfully complete their service plans by the time of trial. *See id.* § 263.307(b)(10). Mother completed individual counseling.

19

Mother also completed a two-hour parenting class. Six months in to her services, she was asked to complete additional parenting classes. DFPS did not receive a certificate of completion by the time of trial.

Father attended two or three sessions of individual counseling at the beginning of the case. In January 2012, he asked if he could start attending counseling again. Since then, he only attended another one or two sessions by the time of trial. Father was also asked to complete a positive discipline course, but he did not turn in a certificate of completion to DFPS for the course. During trial, Mother presented certificates of completion of the positive discipline course for both parents.

Both parents regularly attended visitation. Father missed approximately one visitation a month because of his work schedule. Mendez testified that Father was bonded to the children. *See id.* § 263.307(b)(12)(B). Mendez did express concern that Jeffery was not interacting with the family at the beginning of the case, but by the time of trial, he was interacting well with the whole family.

Mother testified that Jeffery had been doing fine in school while in her care. She believed that he was performing at an advanced level for his age. Mother testified that she disciplined her children by reprimanding them and taking away their toys. She said she has never spanked them, but she did not know if Father had ever spanked them. Mendez testified that when Jeffery came into care, he was "very violent," and would act out and punch and kick other children. *See id.* § 263.307(b)(12)(F). Jeffery was very angry and was suspended soon after

20

starting school. Mendez said this was not typical behavior for a four-year-old. She testified that Jeffery was doing much better by the time of trial. He was no longer getting suspended from school, although he still had some "issues with boundaries." Mendez believed that Jeffery's relationship with his siblings was "way better" than it had been. She said, "He's a lot more loving. He used to push and, you know, was really kind of aggressive with his siblings, but just recently, I think it was last Friday, I observed him just playing with his siblings and loving on them and actually asking, are you okay?"

Mother worked as a house cleaner and Father worked as a roofer. Mother testified that she and Father pay equal shares of the bills, and they do not struggle to pay them. Mother had worked for her employer for about three months by the time of trial. Before her current job, Mother had not been working; she testified that this was the only job she had held in the year before trial. Father earned around $1,000 to $1,200 a week. Mother testified that sometimes Father was paid in cash and sometimes he received a check. Mother did not provide DFPS with any income verification documents. She testified that she made about $400 a week. Mother has a daughter who lives in Honduras with Mother's ex-mother-in-law. Mother sends $200 every other week to support her daughter.

Mother drove Father's truck, but she did not have a U.S. driver's license. Father said he had a driver's license from Mexico. Father said that if the children had been returned to him at trial, they could have gone home with him "and do

21

well and in the future have a career." He said he could pay his sister-in-law to take care of them while he and Mother were at work. Father said the children had been registered at school and he would make sure they were registered again if they were returned.

Mendez testified that the Department believed that adoption was the best plan for the children because it provided permanency. The children were placed in a dual-licensed foster home, but the foster home indicated that they were not interested in adopting the children. Mother testified that she did not know if her children were being abused or neglected in their foster care but at her last visitation, Mother said Jeffery's thumb was injured. In January 2012, a family friend, S.J.P., offered to adopt the children if the parents' rights were terminated. DFPS conducted a home evaluation, but was concerned that S.J.P. was not making enough money to support herself and the children. All of the other placements suggested by the parents were denied for various reasons, including that all of the suggested placements were living illegally in the United States, which would prevent them from adopting the children through DFPS.

DFPS had begun home studies for potential adoptive placements for the children. Mendez testified that, at the time of trial, DFPS had about ten to fifteen potential placements that the Department believed were good candidates for the children. Mendez testified that if the parents' rights were terminated, DFPS planned to immediately move the children in to one of the preapproved adoption-

22

motivated homes. She believed that it would be relatively easy to find an adoptive home for the children.

### B. The evidence is sufficient

Mother continued to leave her children unsupervised, despite a documented previous instance of danger to the children and services to prevent a reoccurrence of neglectful or abusive parenting. The children reported multiple incidences of physical violence in their home and they did not want to return to Mother and Father. The parents did not complete their service plans, including demonstrating their ability to protect the children from future abuse or neglect or identifying the cause of Mark's injuries. Considering the relevant statutory and *Holley* factors, we hold that, in light of the entire record, and giving due consideration to evidence that the jury could have reasonably found to be clear and convincing, the trial court could reasonably have formed a firm belief or conviction that termination of Father's parental rights to Mark and Mother's parental rights to Jeffery, Monica, and Mark was in the children's best interests. *See In re A.T.K.*, No. 02-11-00520-CV, 2012 WL 4450361, at *15 (Tex. App.—Fort Worth Sept. 27, 2012, no pet. h.) (mem. op.) (upholding trial court's best interest finding when, among other things, mother could not provide an explanation for her two-month-old's broken bones); *In re T.T.F.*, 331 S.W.3d 461, 486–87 (Tex. App.—Fort Worth 2010, no pet h.) (upholding trial court's best interest finding when, among other things, the child was diagnosed with failure to thrive and overcame that while in foster care). Accordingly, the evidence is

legally and factually sufficient to support the trial court's family code section 161.001(2) best interest findings. We overrule Mother's third issue and Father's third issue.

## Conclusion

Having overruled Mother's and Father's issues, we affirm the trial court's judgment.

LEE GABRIEL
JUSTICE

PANEL: DAUPHINOT, GARDNER, and GABRIEL, JJ.

DELIVERED: November 29, 2012